UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>CHANTEL EPSTEIN,<br><br>    Defendant. | Case No. 18-CR-0011-TMB<br><br>**MOTION AND MEMORANDUM FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)** |

Chantel Epstein, through undersigned counsel, respectfully moves this Court to grant her compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on "extraordinary and compelling reasons" presented by her vulnerability to COVID-19. According to the Bureau of Prison's own medical records, Ms. Epstein is at heightened risk for death or serious illness due to COVID-19. See Exhibit A, at 78 (stating that "inmate does have medical conditions which is [sic] associated with an increased risk of severe illness and/or mortality related to COVID-19.") Ms. Epstein is placed at this heightened risk due to her obesity, hypertension, and an untreated enlarged heart. Id.

The Bureau of Prisons has been unable to contain the spread of COVID-19, including in the facility to which the BOP has designated Ms. Epstein, FCI Phoenix, which has had numerous COVID-19 outbreaks. Ms. Epstein's continued detention within the BOP places her at a high and unfair risk for serious illness or death. For those reasons, as further explained below, Ms. Epstein moves this Court to grant her compassionate release. Additionally, Ms. Epstein's five year old son who suffers from a variety of disabilities has not been getting the care he needs as there is no primary caretaker for her son while incarcerated. If released, Ms. Epstein would live with her father, a retired investigator for law enforcement for the State of Alaska, and with her son.

## STATEMENT OF FACTS

On August 30, 2019, this court sentenced Ms. Epstein to 60 months incarceration with 5 years of supervised release to follow for violating 21 U.S.C. § 846. Dkt. 131. Ms. Epstein was charged with conspiring with Kevin Leopard-Kinney to distribute drugs. Dkt. 14. According to the Presentence Report, Ms. Epstein relapsed into using heroin again in the summer of 2017 after her relationship with her son's father ended and her mother committed suicide. PSR ¶ 51.[1] To help finance her drug habit, she permitted her address to be used by Mr. Leonard-Kinney for the delivery of his drug packages. PSR ¶ 14 ("Epstein was paid in heroin for allowing her address to be used, and after receiving the heroin Epstein sold some of the heroin and used some of the heroin.")

The drugs that Mr. Leopard-Kinney imported were both methamphetamine and heroin, but Ms. Epstein was using only heroin and was paid for the use of her address only in heroin. Id. The importation of methamphetamines, a drug that Ms. Epstein never used or distributed, by Mr. Leopard-Kinney results in an additional 8 levels under the United States Sentencing Guidelines.[2] This resulted in a presumptive sentence that was approximately twice what would have been called for if the Court's analysis of her sentence began at a level 22. Stated plainly, absent the methamphetamine that Ms. Epstein never requested, used, sold, or distributed, it is likely that Ms.

---

[1] Ms. Epstein has been taking drug treatment classes while at the BOP. She is ineligible for the RDAP program because her codefendant possessed a firearm at the location where she was arrested. See e.g., PSR ¶ 21 (stating that 2 levels should be added if a weapon was present and that the hotel room where she was arrested had several firearms) but also finding that "Leonard-Kinney possessed firearms in connection with the offense [and that] there is no indication that [Ms. Epstein] directly possessed firearms." Probation Sentencing Recommendation ¶ 3.

[2] As the PSR states, "there is no indication the defendant was involved in the sale of the methamphetamine …[which] resulted in a substantially greater converted drug weight than the heroin." PSR ¶ 23. If calculated separately, the methamphetamine recovered results in a level 30 and the amount of heroin results in a level 22. Once converted to converted drug weight, the level is 32. PSR ¶ 20 and United States Sentencing Guidelines § 2D1.1(c)(5) and (9). Because Ms. Epstein was found to be a minor participant, two levels are reduced for a final level of 30. However, this is still 8 levels above the heroin drug weight, which is the only drug that Ms. Epstein *actually* possessed, distributed or used.

Epstein would have already been released from the Bureau of Prisons.

Nevertheless, Ms. Epstein has served more than 55% of her sentence. Her current release date is November 13, 2022. Including goodtime, this results in a total sentence of 1,553 days, of which she has served more than 850 days. A sentence to time served is the functional equivalent of a 32-month sentence.

Additionally, Ms. Epstein has made great strides while at the Bureau of Prisons in working on her addiction. As this Court is well aware, addiction is a lifelong struggle and it is the rare addict who can stay sober without help. Through the meetings that Ms. Epstein currently attends, she has received cognitive therapy that has helped her to identify her triggers and, when she reaches the low points that all of us reach, to ask for and seek help.[3] Though immature in her twenties, Ms. Epstein has matured now that she is, as discussed further below, the sole parent for her disabled son.

However, the Bureau of Prisons is experiencing an unprecedented and uncontrolled COVID-19 outbreak. According to the BOP's own statistics, *every* facility either is having or has had an outbreak of COVID-19. See BOP COVID-19 Update, https://www.bop.gov/coronavirus/index.jsp (last accessed December 3, 2020). At FCI Phoenix, where the BOP has placed Ms. Epstein, there are currently 31 active cases and 41 recovered cases in the inmate population. Id. Although 72 cases may appear moderate, that represents almost 10%

---

[3] Additionally, Ms. Epstein was denied the benefit of a sentence reduction available through the RDAP program because her co-defendant possessed firearms and firearms are a disqualifying factor in a sentence reduction through the RDAP program. See, BOP Program Statement # 5331.02 (Mar. 16, 2009) http://www.bop.gov/ DataSource/execute/dsPolicyLoc and Probation Sentence Recommendation, paragraph 3, stating that "there is no indication that the defendant [Ms. Epstein] directly possessed the firearms." If Ms. Epstein had access to the sentence reduction under the RDAP Program, it is likely that she would be close to release.

of the inmate population at FCI Phoenix and represents an infection rate that is 318 ***times*** than that in the general population.[4]

For inmates like Ms. Epstein, inaction will likely result in her being infected with COVID-19, and because of her comorbidities she is at a heightened risk for serious illness or death from the disease. These are not the statements from her attorney, but are actually reflected in her own medical records as kept by the Bureau of Prisons which states, unequivocally, that because of Ms. Epstein's comorbidities, the "inmate does have medical conditions which is [sic] associated with an increased risk of severe illness and/or mortality related to COVID-19." See Exhibit A, at 78. There is no question that the offense for which Ms. Epstein is serving time for is serious, but as a non-violent minor participant in a drug conspiracy in which her main motivation was to feed her own drug habit, death or serious illness is unfair and unjust.

## ARGUMENT

Ms. Epstein's underlying medical conditions make her especially vulnerable to COVID-19, constituting "extraordinary and compelling reasons" for relief. Ms. Epstein's release does not pose a danger to the community, and a balancing of the § 3553(a) factors with the risks to Ms. Epstein posed by COVID-19 warrants relief.

### A. The Court Has the Authority to Consider Ms. Epstein's Motion Because Ms. Epstein Has Exhausted Her Administrative Remedies.

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the Bureau of Prisons (BOP), Congress expanded the statute in the

---

[4] As of November 12, 2020, the COVID Tracking Project estimated that 1 in 378 Americans had tested positive for COVID-19. See The Covid Tracking Project, <u>A Nationwide Case Surge Hits US Hospitals This Week</u>, https://bit.ly/3obmayM. This represents an infection rate of .0264% compared to the 8.4% at FCI Phoenix.

First Step Act of 2018. Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i), now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

In this case, the timing provision has been satisfied. Ms. Epstein submitted a request for reduction in sentence to the warden of her facility on April 12, 2020, which was denied on June 5, 2020.

> **a. This Court Is Not Bound by the U.S.S.G. Policy Statement When Determining Whether There Are "Extraordinary and Compelling" Reasons for A Reduction in Sentence.**

The compassionate release provision in 18 U.S.C. § 3582(c)(1)(A) authorizes a court to modify a term of imprisonment "after considering the factors set forth in § 3553(a) to the extent they are applicable, if it finds that— (i) extraordinary and compelling circumstances warrant a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes.

The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health combined with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). The commentary also includes a fifth catch-all provision for

"extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, cmt. n.1(D).

However, the Guidelines policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP.

Because the Commission has not updated its policy statement to account for the changes imposed by the First Step Act, the existing policy statement no longer "complie[s] with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under Section 3582." United States v. Cantu, 423 F.Supp.3d 345, 351 (S.D. Tex. June 17, 2019).

Further, because Congress enabled incarcerated persons to file "direct motions to district courts" for sentence modification in part to "increase the use of compassionate release," the "only way" to give force to that command "is to allow district judges to consider the vast variety of circumstances that may constitute 'extraordinary and compelling.'" United States v. Brown, 411 F.Supp.3d 446, 451 (S.D. Iowa 2019); United States v. Redd, 444 F.Supp.3d 717, 725 (E.D. Va. March 16, 2020) (citing cases).

For these reasons, the Second, Sixth and Seventh Circuits – as well as the overwhelming majority of district courts around the country – have ruled that courts can determine whether any extraordinary and compelling reasons other than those delineated in the policy statement warrant sentence modification. United States v. Gunn, -- F.3d --, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) ("[B]ecause the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion."); United States v. Jones, -- F.3d --, 2020 WL 6817488, at *1 (6th Cir. Nov. 20, 2020) ("U.S. Sentencing Guideline

§ 1B1.13 is not an "applicable" policy statement in cases where incarcerated persons file their own motions in district court for compassionate release."); United States v. Brooker, 976 F.3d 228, 237 (2d Cir. Sept. 25, 2020) (absent updated guidance from the Sentencing Commission, the First Step Act allows courts to independently determine any extraordinary and compelling reasons for a sentence reduction even if not enumerated under § 1B1.13); see also United States v. Rodriguez, 451 F.Supp.3d 392, 400 (E.D. Pa. Apr. 1, 2020) ("this Court has discretion to assess whether Mr. Rodriguez presents "extraordinary and compelling reasons" for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement."); United States v. Brown, 411 F.Supp.3d 446, 449 (S.D. Iowa 2019), order amended on reconsideration, 457 F.Supp.4d 691 (S.D. Iowa 2020) (same).

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) which implicitly recognizes that other "compelling reasons" could exist aside from what is listed. See United States v. Urkevich, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that § 1B1.13 never "suggests that [its] list [of criteria] is exclusive"); United States v. Beck, 425 F.Supp.3d 573 582 (M.D.N.C. June 28, 2019) ("Read as a whole, the application notes suggest a flexible approach ... [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

To the extent that Section 1B1.13 has any application, the Court should view itself as standing in the position of the Bureau of Prisons. And now that the Court stands in the shoes of the Bureau of Prisons, it is up to the Court to decide what circumstances qualify. See Brown, 411

F.Supp.3d at 449. The Government has conceded this point in other cases.[5]

Here, this Court has discretion to assess whether Ms. Epstein's presents "extraordinary and compelling reasons" for release, regardless whether they fall within or outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement.

> **b. Ms. Epstein can establish "extraordinary and compelling" reasons based on her medical vulnerability to COVID-19, pursuant to U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).**

Even if this Court finds that it is constrained by the existing Guidelines policy statement, Ms. Epstein qualifies as an inmate suffering from a medical condition that "*substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.*" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

A number of courts have concluded that releasing inmates who are especially vulnerable to coronavirus is consistent with Comment Note 1(A)(ii)(I).[6] For example, in United States v. Zukerman, the district court found that Mr. Zukerman's age, combined with his medical conditions which included diabetes and hypertension, qualified as chronic conditions that in the context of the COVID-19 pandemic substantially diminished the defendant's ability to provide self-care in a correctional environment. 451 F.Supp.329, 335 (S.D.N.Y. Apr. 3, 2020).

In compassionate release proceedings across the country – including this district – the Department of Justice has taken the position that inmates suffering from medical conditions

---

[5] In United States v. Young, the Government conceded that although the policy statement provided "useful guidance," the statement was not binding on the court. 458 F.Supp.3d 838, 840 (M.D. Tenn. Mar. 4, 2020). The court went on to hold that federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons.

[6] Those orders that weigh COVID-19 vulnerability in the compassionate-release calculus include Miller v. United States, 453 F. Supp.3d 1062 (E.D. Mich. Apr. 9, 2020); United States v. Colvin, 451 F.Supp.3d 237 (D. Conn. Apr. 2, 2020); United States v. Resnick, 451 F.Supp.3d 262 (S.D.N.Y. Apr. 2, 2020); United States v. Gonzalez, 451 F.Supp.3d 1194 (E.D. Wash. Mar. 31, 2020); *United States v. Muniz*, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020); United States v. Campagna, -- F. Supp.3d -- 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020).

placing them at greater risk of injury or death due to COVID-19 exposure have established "extraordinary and compelling" grounds for release under 18 U.S.C. § 3582(c). See United States v. Wholecheese, Case No. 4:16-cr-8-RRB, Doc. 61 at 6 (Gov. Opp. Br.) ("The government concedes that the CDC considers diabetics a high-risk group for COVID-19 . . . and that extraordinary circumstances therefore currently exist." (citing U.S.S.G. §1B13.1, application note (1)(A)(ii)(I).")).

In a supplemental filing made in United States v. Wise, the Government acknowledged that under DOJ's own guidance, the defendant's diabetes diagnosis constituted "extraordinary and compelling circumstances," during the current pandemic, which justified compassionate release. United States v. Wise, 1:18-cr-00072-ELH, Doc. 185 (D. Md. May 18, 2020). The Government has made similar concessions in dozens of other cases.[7]

Consequently, it would be disingenuous if the Government fails to concede that Ms. Epstein's has established extraordinary and compelling grounds for release, as that position would contradict DOJ's own guidance.

Based on Ms. Epstein's medical vulnerabilities to COVID-19, she cannot exercise self-care in a correctional setting during the pandemic. Ms. Epstein therefore satisfies the U.S.S.G. policy statement found at U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

---

[7] See, e.g., Government's Supplemental Response, United States v. Firebaugh, 1:16-cr-20341-UU, ECF 43 (SD. Fl. Jun. 1 2020) (defendant's COPD and Type II diabetes present "'serious physical or medical condition(s) ... that substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover.'"); Government's Response, *United States v. Feucht*, 0:11-cr-60025, ECF 51 (S.D. Fla. May, 26, 2020) (conceding that if defendant presents one of the CDC risk factors as confirmed by medical records, and who is not expected to recover from that condition, presents an extraordinary and compelling reason that would allow compassionate release even if that condition in ordinary times would not allow compassionate release); Government's Response, United States v. Washington, 4:04-cr-02090-DCB-HCE, ECF 484 (D. Az. May 22, 2020) (same); Government's Response, United States v. Hird, 2:13-cr-0039-TJS, ECF 650 (E.D. Pa. May 19, 2020) (same).

**B. COVID-19 Has Killed an Ever-Increasing Large Number of Americans, And for Those Who Survive, Long-Term Health Consequences Follow. The Risk Is the Highest for Those Held in Facilities Like Prison and Jails.**

As of the filing of this motion, approximately 1 in 1,300 Americans have died due to COVID-19. See U.S. Surpasses 250,000 COVID-19 Deaths available at https://www.npr.org/2020/11/18/936443162/u-s-surpasses-250-000-covid-19-death. More than 1 in 378 have tested positive. See https://covidtracking.com/blog/weekly-update-nov-12. For those who survive, the long-term impacts are not completely known but may include long term damage to the heart, lungs, and brain. See COVID-19 (coronavirus): Long-term effects ("COVID-19 symptoms can sometimes persist for months. The virus can damage the lungs, heart and brain, which increases the risk of long-term health problems.") available at https://www.mayoclinic.org/diseases-conditions/coronavirus/ in-depth/coronavirus-long-term-effects/art-20490351.

There is no doubt that institutional settings like prisons and jails make the outbreak more difficult to control among a population that is more at risk from death or serious consequences from infection from COVID-19.[8] According to the CDC, COVID-19 is likely to spread more quickly in correctional facilities than in non-correctional environments. See Coronavirus Disease 2019 (COVID-19): Guidance for Correctional & Detention Facilities, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correctional-detention/guidance-correctional-detention.html (last updated Oct. 21, 2020).[9] It is also well established that COVID-19 case rates have been substantially higher and are escalating much more rapidly in prisons than in the U.S. population as a whole. According to a recent study published in the Journal of the American Medical Association (JAMA), the known infection rate for COVID-19 in jails and

---

[8] See Exhibit C, Declaration of Dr. Chris Beyer.
[9] See also, Joseph A. Bick, Infection Control in Jails and Prisons, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), available at https://doi.org/10.1086/521910.

prisons is about 5.5 times higher than the general population, and the fatality rate is approximately 3 times higher.[10]

These statistics have been born out with the observed data from the BOP. The rate of COVID-19 within the BOP is more than four times that in the general public and has spread to every facility within the BOP.[11] To date, 145 inmates have died due to COVID, and the vast majority had some form of comorbidity.[12] Importantly, age is not a determining factor in dying from COVID-19 in the BOP.[13] The Office of the Inspector General has found in the institutions it examined widespread failings in controlling the spread of COVID-19. See, Office of the Inspector General, Pandemic Response Report 21-003 (available https://oig.justice.gov/sites/default/files /reports/21-003.pdf). The report found that the BOP facilities failed to follow BOP and CDC guidelines, failed to isolate positive inmates, and a general shortage of protective equipment. Id.[14]

The outbreaks at FCI Phoenix have been greater than the BOP overall. As of December 3, 2020, there was an outbreak of more than two dozen COVID cases. The rate of infection for the inmate population is 8.4%, a rate of infection that is 318 times greater than the already out of control rates found in the general population.[15] Moreover, the care that Ms. Epstein has received

---

[10] Brendan Saloner, Kalind Parish, Julie A. Ward, et. al, COVID-19 Cases and Deaths in Federal and State Prisons, JOURNAL OF AMERICAN MEDICAL ASSOCIATION (July 8, 2020), available at https://jamanetwork.com/journals/jama/article-abstract/2768249

[11] The CDC COVID Data Tracker states that since cases reported since January 21, 2020, there have been 38.5 cases per 1,000. See, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100k (last accessed November 25, 2020). The BOP COVID Cases portal shows that there have are or have been 23,722 positive cases, which results in a rate of 170.388 per 1000. https://www.bop.gov/coronavirus/index.jsp (last accessed November 25, 2020). Additionally, the BOP COVID website shows that every facility has some form of COVID outbreak.

[12] See e.g., https://www.bop.gov/resources/press_releases.jsp.

[13] For example, on November 25, 2020, the BOP announced the death of a 48-year-old inmate from COVID-19. https://www.bop.gov/resources/news/pdfs/20201124_press_released.pdf, the day before the BOP announced the death of a 41-year-old inmate died. https://www.bop.gov/resources/news/pdfs/20201124_press_release_latuna.pdf

[14] See also, Jemina McEvoy, Forbes, Federal Prison Didn't Isolate Covid-Positive Inmates From Others For 6 Days, DOJ Probe Finds, November 17, 2020 (available at https://www.forbes.com/sites/jemimamcevoy/2020/11/17 /federal-prison -didnt-isolate-covid-positive-inmates-from-others-for-6-days-doj-probe-finds/?sh=1e038c092dba).

[15] See footnote, 4, supra.

at FCI Phoenix has been subpar. She was evaluated for an enlarged heart but has not received any follow-up care. See Exhibit A, at 5.

Absent a widely distributed and effective vaccine, the most effective defense to COVID-19 is social distancing. CDC How To Protect Yourself & Others https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (advising everyone to wash hands, avoid close contact, and wear a mask). However, "Prisons by design are not made for social distancing." Statement of BOP Director Michael Carvajal at Senate Judiciary Hearing on Incarceration During COVID-19, held June 2, 2020 (transcript available at https://www.rev.com/blog/transcripts/senate-judiciary-hearing-transcript-on-incarceration-during-covid-19). As such, those incarcerated are more likely to be infected than the general public, their access to medical care is at a lesser standard than the general public, and their death rate is higher than the general public.[16]

Amid this unfolding crisis, the universally-recommended antidote is simple: reduce the prison population by releasing those whose continued incarceration is not necessary to protect the public, so that correctional institutions can better protect those who need to stay incarcerated. Ms. Epstein is exactly the type of individual deserving of compassionate release: She is at risk of severe illness and, as discussed below, her release would not pose a danger to the community, and balancing of the § 3553(a) factors warrants the requested relief.

---

[16] Kevin T. Schnepel, National Commission on COVID-19 and Criminal Justice, COVID-19 in US State and Federal Prisons, September 2020 (available at https://covid19.counciloncj.org/2020/09/02/covid-19-and-prisons/). The report found that the on average, the mortality rate for those in prison was twice that of the general population. Moreover, the rate of infection was *four* time that of the general population. See also, Office of the Inspector General Review of the Federal Bureau of Prisons' Medical Staffing Challenges, March 2016, (finding systematic deficiencies in the medical system at the Bureau of Prisons).

**C. Ms. Epstein's Situation Presents an "Extraordinary and Compelling" Reason Warranting a Reduced Sentence.**

> *a. Ms. Epstein's Obesity and Hypertension Places Her at Significant Risk for Death or Serious Illness If Infected With COVID-19.*

The Centers for Disease Control ("CDC") have identified several factors that put individuals at higher risk for severe illness after they contract COVID-19, regardless of their age, including those like Ms. Epstein who suffer from obesity and hypertension. The CDC states obesity "defined as a body mass index (BMI) between 30 kg/m2 and <40 kg/m2 or severe obesity (BMI of 40 kg/m2 or above), increases your risk of severe illness from COVID-19." CDC, <u>People of Any Age with Underlying Medical Conditions</u>, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Ms. Epstein has a BMI of 39.9 which makes her severely obese. <u>See</u>, Exhibit A, at 77.

**Bureau of Prisons**
**Health Services**
**Inmate Report Only (formerly labeled ISDS)**

| | |
|---|---|
| Reg #: 20395-006 | Inmate Name: EPSTEIN, CHANTEL JALYNN |

SENSITIVE BUT UNCLASSIFIED – This information is confidential and must be appropriately safeguarded.

TB Clearance: Yes

| | | | |
|---|---|---|---|
| Last PPD Date: 10/20/2019 | | Induration: 0mm | |
| Last Chest X-Ray Date: | | Results: | |
| TB Treatment: | | Sx free for 30 days: Yes | |
| TB Follow-up Recommended: No | | | |

Body mass index (BMI) 39.0-39.9, adult          Current

Exhibit A, page 77.

In addition to her obesity, Ms. Epstein suffers from health effects related to her weight. This includes loss of feeling in her extremities.

**Bureau of Prisons**
**Health Services**
**Clinical Encounter**

| | | | |
|---|---|---|---|
| Inmate Name: EPSTEIN, CHANTEL JALYNN | | Reg #: | 20395-006 |
| Date of Birth: | Sex: F Race: WHITE | Facility: | PHX |
| Encounter Date: 04/27/2020 12:16 | Provider: Green, Marni DNP | Unit: | C08 |

Mid Level Provider - Sick Call Note encounter performed at Health Services.

**SUBJECTIVE:**

    **COMPLAINT 1**    **Provider:** Green, Marni DNP

    **Chief Complaint:** Other Problem

    **Subjective:**  Sick call requesting to be seen with c/o ankles are super swollen and part of left foot is numb. Discussed xray results with her negative right knee and negative C spine. She states today that it is really her left knee that bothers her more often. She also states her left foot has causes her to fall when coming off top bunk d/t being numb. She has other issues she would like to discuss today, however aware she will need to request second sick call (breast issue).

    **Pain:**  Not Applicable

Exhibit A, page 32.

The Bureau of Prisons recognizes that this places Ms. Epstein at a heighted risk for serious illness or death. The medical records from the BOP state, unequivocally, that:

Comments:
Per Health Services:
1.    COVID-19 is highly contagious via respiratory droplets when a person with infection coughs, sneezes, or talks infecting another person who is usually within less than 6 feet and/or by touching an infected surface and then touches his or her eyes, nose, or mouth. Given the close living situation and sharing of all facilities in a prison setting, inmates are at higher risk for transmitting/contracting COVID-19 infection than general population.
2.    This inmate does have medical conditions which is associated with an increased risk of severe illness and/or mortality related to COVID-19 as identified by CDC June 2020 update. BMI 39
3.    This inmate does not have medical follow up pending within 90 days.

Exhibit A, page 78.

Ms. Epstein also suffers from hypertension which exacerbates her other health problems.

**Bureau of Prisons**
**Health Services**
**Clinical Encounter**

| Inmate Name: EPSTEIN, CHANTEL JALYNN | | Reg #: 20395-006 |
|---|---|---|
| Date of Birth: | Sex: F Race: WHITE | Facility: PHX |
| Encounter Date: 07/24/2020 14:51 | Provider: Green, Marni DNP | Unit: C08 |

Mid Level Provider - Follow up Visit encounter performed at Health Services.

**SUBJECTIVE:**

COMPLAINT 1    Provider: Green, Marni DNP

    Chief Complaint: HYPERTENSION

    Subjective:

      She is also aware has gained weight and now consistently hypertensive > 130/80. She has now 2 readings > 150s. Will obtain labs for review and discuss starting treatment at follow up. Will also order EKG and CXR. She is aware of her personal risk for CVD given her FM HX. She is also aware of modifiable risk factors discussed previously.

Pain: No

**OBJECTIVE:**

**Blood Pressure:**

| Date | Time | Value | Location | Position | Cuff Size | Provider |
|---|---|---|---|---|---|---|
| 07/24/2020 | 14:53 PHX | 150/97 | | | | Green, Marni DNP |

Exhibit A, page 7.

These health issues place Ms. Epstein at an unnecessary and unfair risk from becoming seriously ill or dying from COVID-19 while being detained at the Bureau of Prisons. Obesity (defined as a BMI of 30 or greater) has consistently been a strong predictor of severe COVID-19 illness across a number of studies.[17] And obesity and high blood pressure consistently lead to underlying conditions – currently present in 46.2% and 59% of hospitalizations for COVID-19. COVID-NET: COVID-19-Associated Hospitalization Surveillance Network, Centers for Disease

---

[17] See, e.g., Lighter, J., et al., Obesity in Patients Younger Than 60 Years Is a Risk Factor for COVID-19 Hospital Admission. Clinical Infectious Diseases, 2020, available online at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7184372/pdf/ciaa415.pdf; Simonnet, A., et al., High Prevalence of Obesity in Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV- 2) Requiring Invasive Mechanical Ventilation. Obesity (Silver Spring), 2020, available online at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7262326/pdf/OBY-9999-na.pdf; Kalligeros, M., et al., Association of Obesity with Disease Severity Among Patients with Coronavirus Disease 2019. Obesity, 2020(n/a), online at: https://onlinelibrary.wiley.com/doi/epdf/10.1002/oby.22859.

United States v. Epstein, 18-CR-0011-TMB       Page | 15
Motion for Compassionate Release

Control and Prevention, <u>Selected Underlying Medical Conditions</u>, available online at: https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (last accessed December 4, 2020).

COVID-19 is a novel virus, and thus how the virus impacts the body is not completely known. However, what *is* known is that hypertension shows up in most of the COVID-19 hospitalizations. "A large US study of 5,700 hospitalized patients revealed an overall hypertension rate of 56%, similar to hypertension rates reported from China and Italy (50% and 49%, respectively)." Arjun Kanwal, et al, American College of Cardiology, <u>COVID-19 and Hypertension: What We Know and Don't Know</u>, July 6, 2020 (available at https://www.acc.org/latest-in-cardiology/articles/2020/07/06/08/15/covid-19-and-hypertension). As such, hypertension is a significant risk factor for death or serious illness from COVID-19. Because hypertension is so prevalent in critically ill COVID-19 patients, one theory is that the virus attacks the renin-angiotensin-aldosterone system (RAAS) which helps the body regulate blood pressure. <u>Id.</u> Current studies are underway to better understand the link, but this Court need not know the mechanism in which COVID-19 causes serious illness with those with hypertension, but rather simply that those who have hypertension are at a high risk for seriously complications and even death from COVID-19.

Because of the unfair and unnecessary risk of death or serious illness that is presented from having severe obesity and hypertension with COVID-19, particularly for a non-violent drug offender like Ms. Epstein, this Court should grant compassionate release on these grounds alone. U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). In fact numerous courts have found that inmates like Ms. Epstein who suffer from CDC-recognized vulnerabilities are afflicted with a medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." <u>See</u>

e.g., United States v. Jackson, 2020 WL 3396901, at *5 (N.D. Ind. June 19, 2020) (defendant suffering from hypertension and bronchitis); United States v. Madrigal, 2020 WL 3188268, at *2 (N.D. Cal. June 15, 2020) (defendant suffering from severe obesity and hypertension); United States v. Perdigao, 2020 WL 1672322, at *1 (E.D. La. Apr. 2, 2020) (hypertension and cardiac problems).

More specific to Ms. Epstein's medical concerns, numerous courts have granted compassionate release for similarly situated defendants around the United States. See, United States v. Hayes, No. 17-20292, 2020 WL 4001903, at *3 (E.D. Mich. July 15, 2020) ("It is widely recognized and publicly acknowledged that persons who are extremely overweight, as the defendant is, face increased risk of severe consequences from potential COVID-19 infection."); United States v. Janis, 2020 WL 7078678 (D. SD Dec., 2, 2020) (reducing sentence to time served based on the defendant's comorbidities, to include obesity and hypertension);  United States v. Brady, No. 18-20106, 2020 WL 7053811, at *1 (E.D. Mich. Dec. 2, 2020) (granting compassionate release based on the defendant's obesity, defined as a BMI of 36.8 and as a former smoker); United States v. Foreman, 2020 WL 2315908 at *3 (D. Conn. May 11, 2020) (granting time served under § 3582(c)(1)(A) for inmate with hypertension and obesity where "the number of cases of COVID-19 at FCI Danbury creates potentially catastrophic consequences for her."): See also United States v. Salvagno, __F.Supp.3d__, 2020 WL 3410601 (N.D.N.Y Apr. 23, 2020), reconsideration denied, No. 5:02-CR_51, Dkt. No. 1181, June 22, 2020) (granting a subsequently affirming compassionate release to inmate with high blood pressure).[18]

---

[18] See also, United States v. White, No. 2:13-cr-20653-MFL-MAR-1, 2020 WL 2557077 (E.D. Mich. May 20, 2020); United States v. Sarkisyan, No. 3:15-cr-00234-CRB-15, 2020 WL 2542032 (N.D. Cal. May 19, 2020); United States v. Anderson, No. 3:15-cr-30015-SEM-TSH-1, 2020 WL 2521513 (C.D. Ill. May 18, 2020); United States v. Johnson, No. 15-CR-125 (KBJ), 2020 WL 2515856 (D.D.C. May 16, 2020); United States v. Pomante, No. 19-20316, 2020 WL 2513095 (E.D. Mich. May 15, 2020); United States v. Brooks, No. 07-CR-20047-JES-DGB,

### b. Ms. Epstein Suffers from an Enlarged Heart Which Places Her at a Higher Risk for Serious Illness or Death If Infected With COVID-19.

In addition to Ms. Epstein's risk factors of obesity, hypertension and paresthesia, Ms. Epstein has a suspected enlarged heart. Her records establish that she has a family history of significant cardiovascular disease and presented with hypertension and possible atrial enlargement of her heart.

**New Laboratory Requests:**

| Details | Frequency | Due Date | Priority |
|---|---|---|---|
| Chronic Care Clinics-Hypertension-Lipid Profile | One Time | 10/30/2020 00:00 | Routine |
| Lab Tests-M-Microalbumin, urine random | | | |
| Lab Tests-U-Urinalysis w/Reflex to Microscopic | | | |
| Chronic Care Clinics-Hypertension-Basic | | | |
| Metabolic Profile (BMP) | | | |
|     Labs requested to be reviewed by: | | Ford, Isaiah MD/CD | |

**New Consultation Requests:**

| Consultation/Procedure | Target Date | Scheduled Target Date | Priority | Translator | Language |
|---|---|---|---|---|---|
| Cardiology | 11/30/2020 | 11/30/2020 | Routine | No | |

Subtype:
    Southwest Desert Cardiology
Reason for Request:
    evaluation and treatment. HTN with possible left atrial enlargement on EKG. + FM HX of significant CVD
Provisional Diagnosis:
    HTN with possible left atrial enlargement on EKG.

**Other:**
    EKG reviewed. SR with possible left atrial enlargement with P >50ms

Exhibit A, page 5.

2020 WL 2509140 (C.D. Ill. May 15, 2020); United States v. Young, No. CR 4:16-40036-TSH, 2020 WL 2514673 (D. Mass. May 15, 2020); United States v. Handy, No. 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); United States v. Cassidy, No. 1:17-cr-00116-WMS-MJR, 2020 WL 2465078 (W.D.N.Y. May 13, 2020); United States v. Barber, No. 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); United States v. Hunt, No. 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); United States v. Ullings, No. 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); United States v. Foreman, No. 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); United States v. Jenkins, No. 99-cr-00439-JLK-1, 2020 WL 2466911 (D. Co. May 8, 2020); United States v. Quintero, No. 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); United States v. Howard, No. 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020); United States v. Lacy, No. 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); United States v. Ardila, No. 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); United States v. Delgado, No. 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); United States v. Dillard, No. 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); United States v. Joling, No. 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); United States v. Trent, No. 3:16-cr-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); United States v. Gross, No. 1:15-cr-00769-AJN-3, 2020 WL 1673244 (S.D. N.Y. Apr. 6, 2020); United States v. Zukerman, No. 1:16-cr-00194-AT-1, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020); United States v. Lassiter, No. 17-232, 2020 WL 3639988, at *4 (D. Md. July 6, 2020) ("The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.");

Although this was first recognized in July 2020, there has been no follow-up on her care. An enlarged heart can be an indicator of cardiovascular disease, which taken with Ms. Epstein's obesity, hypertension and long family history of cardiovascular disease would warrant a more aggressive medical intervention. At least once court has granted compassionate release under similar circumstances. See United States v. Knibbs, No. 5:90-CR- 122, Dkt. No. 221 at 5 (N.D. W.Va. Jun. 2, 2020) (Bailey, J.) (granting motion for a reduced sentence under § 404 of the First Step Act, or in the alternative, under § 3582(c)(1)(A), for inmate "at high risk due to the COVID-19 pandemic" whose pre-existing conditions included high blood pressure and associated enlarged heart). Regardless of whether or not the BOP is acting clinically appropriate in Ms. Epstein's care, the more important issue is that her poor heart health, combined with her obesity, hypertension and paresthesia places her at a significantly high risk for a serious illness or death from COVID-19.

### D. Ms. Epstein's Family Situation Presents a Separate "Extraordinary and Compelling" Reason Warranting a Reduced Sentence.

Ms. Epstein should also be granted relief on the grounds that she is the sole caregiver and guardian to her son who is disabled. Ms. Epstein has a five-year old son who suffers from a variety of ailments, most relevant here, idiopathic clubfoot deformity. See Exhibit B, at 4.  Before her arrest, Ms. Epstein was the sole caregiver and was the party responsible for taking her son to his necessary medical treatments. Id. at 8. Idiopathic clubfoot deformity requires a corrective cast and surgeries and the failure to keep to the proscribed medical regime may lead to a relapse which itself may lead to additional surgeries and medical interventions. Id. at 4-6. The party presently responsible for Ms. Epstein's son, the biological father, has failed to follow this proscribed medical

treatment, has missed important doctor visits and failed to get any of the child's vaccinations since her incarceration. Id. at 2 and 3.

The Sentencing Commission expressly recognizes the incapacitation of the family member caregiver of an inmate's child as grounds for release. U.S. Sentencing Guidelines § 1B1.13(1)(A), cmt. n.1(C). Although the reason for the biological father's unwillingness or inability to care for Ms. Epstein's child is unclear, what *is* clear is that the child is not receiving the appropriate medical care that he needs. Because Ms. Epstein was the sole caretaker for the child before her incarceration, she is the only party capable of ensuring her son has the medical care he needs. As such, for this reason this Court should grant Ms. Epstein compassionate release.

## E. The Relevant § 3553(a) Sentencing Factors Warrant Reducing Ms. Epstein's Sentence to Time Served.

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, Ms. Epstein's compromised physical health, and the unique danger she faces of contracting COVID-19 and becoming severely ill, when combined with the other Section 3553(a) sentencing factors, clearly warrant relief.

Under all the circumstances in this case, the Court should conclude that the time that Ms. Epstein has already served is sufficient to satisfy the purposes of sentencing. Under Pepper v. United States, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a). Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Ms. Epstein for the serious sentence this Court

originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. Helling v. McKinney, 509 U.S. 25, 28 (1993); see also Wallis v. Baldwin, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying Helling to exposure to asbestos); Brown v. Mitchell, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying Helling to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

Most importantly, Ms. Epstein is not a danger to the community. Rather, Ms. Epstein is a non-violent drug offender. Her prior two contacts with the criminal justice system were related to her addiction to drugs. Since her incarceration, she has been drugfree and has had the opportunity to take part in the drug programs offered by the Burau of Prisons. In particular, her treatment has helped Ms. Epstein understand that addiction is not something that can be overcome by herself – but must rely on those around her, her family and her extended support network, to overcome her addiction. Additionally, the time away from her son has made it clear that she alone does not bear the burden of her actions. Rather, through the actions that brought her before this Court, she has endangered the ongoing health of her son.

Ms. Epstein has made great strides through her treatment, which will continue while under the supervision of United States Probation through her supervised release. There are certainly a class of prisoners who are such a danger to society that the calculus between release and detention tends heavily toward continued detention – Ms. Epstein is not such an offender.

Ms. Epstein has a release plan pursuant to which she would live with her father and son. This would allow her to continue her path to sobriety and provide her son with the medical care

that he needs.

## F. CONCLUSION

WHEREFORE, Ms. Epstein moves this Court to grant her compassionate release and release her from the custody of the Bureau of Prisons.

Respectfully submitted this 7th day of December 2020.

s/ Nicholas Vitek
Nicholas J. Vitek
Attorney for the Defendant
Vitek Law LLC
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Tel: 206.673.2800
Fax: 206.408.6823
vitek@viteklaw.com

**Certificate of Service**

I hereby certify that on December 7, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record for the defendants.

<u>s/ Nicholas Vitek</u>
Nicholas J. Vitek
Attorney for the Defendant
Vitek Law LLC
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Tel: 206.673.2800
Fax: 206.408.6823
vitek@viteklaw.com